**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| CAROLYN THOMPSON, § | |
| § | |
| Plaintiff, § | |
| § | |
| VS. § | CIVIL ACTION NO. H-12-922 |
| § | |
| DIVERSIFIED ADJUSTMENT SERVICE, § | |
| INC., § | |
| § | |
| Defendant. § | |

**MEMORANDUM AND OPINION**

Carolyn Thompson sued Diversified Adjustment Service, Inc., alleging that a voicemail message left on her mother's telephone stating that the caller was a debt collector seeking to collect a debt from Thompson violated the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 *et seq.*[1] Thompson seeks actual and statutory damages, attorney's fee and costs, and an injunction prohibiting Diversified from violating the FDCPA. The parties have filed cross-motions for summary judgment, responses to those motions, and replies.

Based on these filings, the pleadings, and the relevant law, Diversified's motion for summary judgment, (Docket Entry No. 19), is denied, and Thompson's motion for summary judgment, (Docket Entry No. 30), is granted in part and denied in part. The court finds that there is a genuine factual dispute as to whether Thompson's alleged debt arises from a loan from her former employer, which would be a consumer debt covered by the FDCPA, or from overpaid commissions, which may not be a consumer debt under the statute. That disputed fact issue precludes summary judgment on

---

[1] Thompson also asserted claims under the Texas Debt Collection Act (TDCA), TEX. FIN. CODE § 392.001 *et. seq.*, and the Texas Deceptive Trade Practices Act (DTPA), TEX. BUS. & COM. CODE § 17.01 *et. seq*. Thompson has voluntarily dismissed those claims. (Docket Entry No. 27).

the current record. A status and scheduling conference is set for **August 6, 2013** at 9:30 a.m. in Courtroom 11-B.

**I.      Background**

In August 2007, Thompson began a job selling insurance for United American Insurance Company. (Docket Entry No. 26, Ex. A at 14–16; Ex. B). Thompson and United American executed an "Independent Agent's Contract." (Docket Entry No. 26, Ex. B). The Contract stated that Thompson would be paid commissions "on premiums received by the Company on business produced by [her] less any premiums returned to the insured for any reason." (*Id*., ¶ 5). The Contract stated that "[United American] may at any time offset against all commissions accrued or to accrue, including vested commissions, if any, any debt due from [Thompson] to the Company, whether now existing or hereafter arising, irrespective of whether demand for payment has been made." (*Id*., ¶ 5). The Contract included a "Loan Agreement" providing that Thompson "may request a loan or loans ('Loan') from [United American] from time to time . . . ." (*Id*., Loan Agreement, ¶ 1). The Agreement stated that "[a]ny Loan made to [Thompson] shall be deemed made pursuant to this Agreement and no further documents need be executed or delivered by [Thompson] to evidence or secure the Loan. An entry in the books and records of [United American] shall be sufficient evidence of the Loan." (*Id*., ¶ 2). According to the Agreement, "[a]ll principal and accrued interest on the Loan will be payable on demand, but if no demand is made, then upon termination of the Contract." (*Id*., ¶ 4). The Agreement further stated that "[a]ny Loan will be deemed indebtedness to [United American] by [Thompson] and will be secured by a first lien (security interest) on commissions payable to [Thompson] from [United American]." (*Id*., ¶ 5). The Agreement included a merger clause stating that "[t]his Agreement contains the entire understanding of the parties and supersedes or merges all prior and contemporaneous agreements and discussions

between the parties. This Agreement may not be amended, modified or changed in any way, except by an instrument in writing, signed by [Thompson] and [United American]." (*Id.*, ¶ 7).

Thompson worked for United American until sometime in 2008. After she resigned, United American hired Diversified to collect money that it believed Thompson owed. (Docket Entry No. 26, Ex. E at 21). Thompson had lived with her mother while she was working for United American. Thompson gave United American her mother's address and phone number as her own contact information. Thompson testified that she moved out of her mother's home soon after she quit working for United American in 2008. (Docket Entry No. 19, Ex. A at 4–5, 11).

On January 17, 2012, a Diversified representative called Thompson's mother's residence. The representative left a voicemail message:

> This message is for Carolyn Thompson. If I've reached the wrong number please call me back at 866-923-2995 [unintelligible] the number and then disconnect now. By continuing to listen to this message you acknowledge you are Carolyn Thompson. This message contains private information. This is Diversified Adjustment Service. This is an attempt to collect a debt, any information obtained will be used for that purpose. Please return my call to 866-923-2995. It's very important to hear back from you. Thank you.

(Docket Entry No. 30, Ex. E). Thompson's mother later played and listened to the message.

Thompson's employment contract with United American, and the content of and circumstances surrounding the voicemail message, are not in dispute. The parties dispute how Thompson's payment obligations to United American arose. Thompson contends that United American provided her loans, or advances on commissions, under her employment agreement. Diversified contends that Thompson's payment obligations did not arise from loans or advances but from commission overpayments.

Thompson stated in an affidavit that "United American . . . paid me by commission, and

3

occasionally would advance payment to me consistent with the terms of my employment agreement." (Docket Entry No. 26, Ex. C ¶ 3). Thompson stated that she "used the money [she] obtained from United American . . . for personal purposes—everyday living expenses, such as clothes and groceries" and "did not use the money . . . for any commercial or business purpose." (*Id*., ¶¶ 4–5). Thompson also submitted a United American monthly payment account statement dated June 24, 2008. The account statement showed that when Thompson's employment ended on June 17, 2008, she had an "advance loan balance" of $2,302.20 that takes into account $48.60 in "new business adjustments." (Docket Entry No. 26, Ex. D). The account statement also stated:

> Your independent agent's contract contains a loan agreement. Paragraph 4 of the loan agreement provides that all principal and accrued interest on the loan will be payable on demand, but if no demand is made, then upon termination of the contract. Please review your independent agent's contract for the full text of the loan agreement.

(*Id*.). The account statement listed Thompson's year-to-date commissions. Including her sales of both new and renewed health and life insurance, Thompson had earned total commissions of $1,926.00. The account statement stated that "[p]ayment of commission will be held in abeyance for 120 days after termination to determine the existence of any sums due [United American] which are to be set off against commissions." (*Id*.).

Diversified points to Thompson's deposition testimony about a United American document listing "chargebacks" against its insurance sales representatives. Thompson acknowledged that the document appeared to show that she owed Diversified $1,840.55. (Docket Entry No 29, Ex. B at 4). She testified that the document also appeared to show that Diversified had charged her to recover commissions it paid based on her insurance sales, after her customers failed to pay their insurance premiums. Diversified did not submit the document that Thompson's testimony was

4

based on into the summary judgment record.

## II.     The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated

assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### III. Discussion

#### A. Whether the Voicemail Message Left at Thompson's Mother's Telephone Number was a Violation of § 1692c(b) of the FDCPA

Diversified contends that the voicemail message that it left for Thompson at her mother's telephone number was not a prohibited third-party communication under the FDCPA. Diversified points to Thompson's testimony that she lived with her mother while she was employed by United American and that she gave her mother's telephone number and address to United American as her contact information. Section 1692c(b) of the FDCPA prohibits a debt collector from communicating "in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector" unless a consumer gives prior consent.[2]

Most courts that have applied § 1692c(b) in similar cases have held that a message left by a debt collector on a voicemail system or answering machine is a "communication" under the FDCPA.[3] The FDCPA broadly defines "communication" as "the conveying of information

---

[2] Section 1692b provides for an exception to § 1692c(b) when a debt collector is communicating with a third-party "for the purpose of acquiring location information about the consumer . . . ." In order to fall within this exception, debt-collectors must, among other things, state their identity, that they are confirming or correcting location information concerning the consumer, and, only if expressly requested, identify their employers without also identifying that the consumer owes a debt. *Id.* at § 1692b(1) & (2). Diversified does not argue that § 1692b applies. Even if Diversified did intend to rely on the exception, the undisputed facts would preclude its application. Diversified disclosed its identity despite the absence of a request that it do so and suggested that Thompson owed a debt. Both of these disclosures are prohibited under § 1692b.

[3] The lone Fifth Circuit decision discussing § 1692c(b) focuses on the scope of the location exception under § 1692b and does not address the issues raised by the parties in this case. *Cushman v. GC Servs., L.P.*,

6

regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692a(2). The voicemail message left on Thompson's mother's phone stated that Thompson owed a debt that the caller was attempting to collect. The FDCPA includes such "indirect" communications as voicemail messages. *See Dona v. Midland Credit Mgmt., Inc.*, 2011 WL 941204, at *1 (E.D.N.Y. Feb. 10, 2011) (stating that "'[c]ommunications' under the [FDCPA] include telephone calls and messages left on a consumer's answering machine"); *Belin v. Litton Loan Servicing, LP*, 2006 WL 1992410, at *4 (M.D. Fla. July 14, 2006) (holding that messages left on the debtor's answering machine were "communications" under the FDCPA); *Foti v. NCO Fin. Sys., Inc.*, 424 F. Supp. 2d 643, 655–56 (S.D.N.Y. 2006) (holding that a voice mail message is a "communication" under the FDCPA); *Hosseinzadeh v. M.R.S. Assocs., Inc.*, 387 F. Supp. 2d 1104, 1115–16 (C.D. Cal. 2005) (same); *Berg v. Merchants Ass'n Collection Div., Inc.*, 586 F. Supp. 2d 1336, 1340–45 (S.D. Fla. 2008) (same).

Thompson is not required to show that Diversified intended to disclose her debt to a third party to assert a § 1692c(b) claim. Courts have generally referred to the FDCPA as a "strict-liability statute" that makes debt collectors liable even for inadvertent violations. *See Glover v. F.D.I.C.*, 698 F.3d 139, 149 (3d Cir. 2012) ("The FDCPA is generally characterized as a strict liability statute because it imposes liability without proof of an intentional violation." (quotation marks and citation omitted)); *McLean v. Ray*, 488 F. App'x 677, 682 (4th Cir. 2012); *Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2d Cir. 2010) ("To recover damages under the FDCPA, a consumer does not need to show intentional conduct on the part of the debt collector."); *Riggs v. Prober & Raphael*, 681 F.3d 1097, 1099 (9th Cir. 2012); *Anderson v. Credit Bureau Collection Servs., Inc.*, 422 F.

---

397 F. App'x 24, 28–29 (5th Cir. 2010).

App'x 534, 538 (7th Cir. 2011); *Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270–71 (11th Cir. 2011) ("The FDCPA typically subjects debt collectors to liability even when violations are not knowing or intentional."); *Kistner v. Law Offices of Michael P. Margelefsky, LLC*, 518 F.3d 433, 438 (6th Cir. 2008). *But see Maynard v. Cannon*, 401 F. App'x 389, 397 (10th Cir. 2010) ("[The plaintiff's] reasoning, that any incorrect statement of the amount owed, no matter in which direction the debt collector erred, nor the amount of the error, results in strict liability for the debt collector, is unfounded in the text of the FDCPA . . . .'" (citation omitted)).

Debt collectors are excepted from the FDCPA's strict-liability standard if they can show "by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." § 1692k(c); *see also Picht v. John R. Hawks, Ltd.*, 236 F.3d 446, 451 (8th Cir. 2001) ("The bona fide error defense exists as an exception to the strict liability imposed upon debt collectors by the FDCPA."). That exception does not apply here. Diversified does not argue or point to evidence suggesting that its procedures for leaving voicemail messages "were reasonably adapted to avoid" prohibited third-party disclosures in either its summary judgment motion or its opposition to Thompson's motion.

Despite the FDCPA's general strict-liability standard, several of the FDCPA's enumerated violations require an intent showing. *See, e.g.*, § 1692d(5) (making a violation of the FDCPA "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously *with intent to* annoy, abuse, or harass any person at the called number." (emphasis added)). Section 1692c(b) lacks such language. "Congress took care to require an element of knowledge or intent in certain portions of the FDCPA where it deemed such a requirement necessary." *Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1176 n.11 (9th Cir.

2006) ((citation omitted)). "[W]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Hillman v. Maretta*, — U.S. —, —, 133 S.Ct. 1943, 1953 (2013) (quotation marks omitted)). Section 1692c(b) does not require Thompson to show that Diversified intended to communicate information about her debt to a third party.

To the extent that § 1692c(b) is ambiguous, both the FDCPA's legislative history and agency interpretations of § 1692c(b) provide additional support for Thompson's contention that Diversified may be liable for leaving a voicemail message at Thompson's mother's phone number. The Senate's Report on the FDCPA states that one type of abuse that the Act was intended to prevent was a debt collector "disclosing a consumer's personal affairs to friends, neighbors, or an employer . . . ." S. Rep. No. 95–382, at 2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 1695, 1696. Congress adopted several provisions designed to limit methods of communication that were especially likely to reveal the existence of a debt to third parties. For instance, § 1692f(7) of the FDCPA prohibits as unfair and unconscionable "[c]ommunicating with a consumer regarding a debt by post card." Similarly, § 1692f(8) states that debt collectors may not use "any language or symbol, other than the debt collector's address, on any envelope when communicating with a consumer by use of the mails or by telegram, except that a debt collector may use his business name if such name does not indicate that he is in the debt collection business." Those provisions prohibit debt collectors from using certain communication methods and apply without regard to a debt collector's intent. The Federal Trade Commission (FTC) explained in a Staff Opinion Letter that, like § 1692f(7) and (8), § 1692c(b)'s purpose was to "prevent unscrupulous debt collectors from embarrassing consumers and invading their privacy by revealing the existence of their debt to friends, neighbors or other third parties." FTC Staff Opinion Letter Borowski Nov. 6, 1992,

available at http://www.ftc.gov/os/statutes/fdcpa/ letters/borowski.htm. The FTC has also stated that "[a] debt collector does not violate this provision when an eavesdropper overhears a conversation with the consumer, unless the debt collector has reason to anticipate the conversation will be [overheard]." Federal Trade Commission Staff Commentary on the Fair Debt Collection Practices Act, 53 Fed. Reg. 50104 (Dec. 13, 1988). Thompson's mother was not eavesdropping and did not overhear a conversation between Diversified and Thompson. The voicemail Diversified left was its initial attempt to contact Thompson, and there is no evidence of any steps to confirm that the number it called belonged to Thompson.[4]

Other courts have consistently concluded that debt collectors may be liable under § 1692c(b) for attempting to collect debts by leaving voicemail messages that were inadvertently heard by third parties. *See, e.g.*, *Marisco v. NCO Fin. Sys., Inc.*, — F. Supp. 2d —, 2013 WL 2285195, at *5 (E.D.N.Y. May 23, 2013); *Travers v. Collecto, Inc.*, 2013 WL 55819, at *3 (D. Mass. Jan. 2, 2013) (holding that a debt collector violated the FDCPA when it left a message on an answering machine

---

[4] Courts have also rejected the argument that a voicemail message from a debt collector cannot violate § 1692c(b) because § 1692e(11) requires that debt collectors identify themselves. This position "is essentially based on the assumption that [a debt collector] is somehow entitled to leave pre-recorded messages." *Foti*, 424 F. Supp. 2d at 658. But "just because a debt collector is permitted to continue to attempt to collect the debt does not entitle the collector to use *any* means, even if those means are the most economical or efficient." *Id.* at 659; *see also Edwards v. Niagara Credit Solutions, Inc.*, 584 F.3d 1350, 1354 (11th Cir. 2009) ("[T]he Act does not guarantee a debt collector the right to leave answering machine messages."); *Berg*, 586 F. Supp. 2d at 1344 ("[There is] no reason that a debt collector has an entitlement to use this particular method of communication."); *Sclafani v. BC Servs., Inc.*, 2010 WL 4116471, at *3 (S.D. Fla. Oct. 18, 2010) ("If [the defendant] could not leave voice messages that simultaneously complied with the multiple applicable provisions of FDCPA, it should not have left the offending voice messages."); *Koby v. ARS Nat. Servs., Inc.*, 2010 WL 1438763, at *6 (S.D. Cal. Mar. 29, 2010) ("[T]his Court follows the reasoning in *Berg* and *Foti* in finding that nothing entitles Defendant to use this particular form of communication."). Diversified could have reduced the risk that its voicemail would be heard by a third party by not leaving a message and instead calling again later.

"directed to a number which, according to the plaintiff, was never associated with him, at a residence where he had not resided for eight months, and as a result information regarding the plaintiff's debt was communicated to the new resident."); *Friedman v. Sharinn & Lipshie, P.C.*, 2013 WL 1873302, at *4 (E.D.N.Y. Mar. 28, 2013) ("[P]laintiff sufficiently alleges that the defendant violated Section 1692c(b) of the FDPCA by sharing personal and confidential information about an alleged debt — presumably without plaintiff's permission via answering machine messages that were overheard by third parties."); *Zortman v. J.C. Christensen & Assocs., Inc.*, 819 F. Supp. 2d 874, 879 (D. Minn. 2011) ("[It is] possible to communicate with someone in spite of lacking a deliberate or purposeful intent to convey something to that particular person — for example, one may communicate with an unintended audience."); *Cordes v. Frederick J. Hanna & Assocs., P.C.*, 789 F. Supp. 2d 1173, 1174 (D. Minn. 2011); *Leahey v. Franklin Collection Serv., Inc.*, 756 F. Supp. 2d 1322, 1327–28 (N.D. Ala. 2010); *Leyse v. Corporate Collection Servs., Inc.*, 2006 WL 2708451, at *4 (S.D.N.Y. Sept. 18, 2006)*; F.T.C. v. Check Enforcement*, 2005 WL 1677480, at *8 (D.N.J. July 18, 2005). *But see Collier v. Professional Bureau of Collections*, 2012 WL 3745720, at *4–5 (D. Md. 2012) ("Looking at the message in the light most favorable to Ms. Collier, it was neither deceptive, threatening, coercive, or abusive. In fact, the message provided ample opportunity for a person, other than Ms. Collier, who received the message to ignore it or delete it. The communication was very specific in that it was directed only to Ms. Collier.").[5]

---

[5] In at least two other cases, courts have limited § 1692c(b) in ways that are not relevant here. In *Zortman v. J.C. Christensen & Assocs., Inc.*, 870 F. Supp. 2d 694 (D. Minn. 2012), the court held that a debt collector did not violate § 1692c(b) when it left a voicemail message at the plaintiff's correct number, did not state the plaintiff's name or that she owed a debt, and a reasonable listener could have assumed that the plaintiff's employer was calling because the plaintiff was herself a debt collector. In *Mostiller v. Chase Asset Recovery Corp.*, 2010 WL 335023 (W.D.N.Y. Jan. 22, 2010), another court held that a plaintiff had not stated a claim under § 1692c(b) because the "plaintiff has made no allegation that defendant knew or could anticipate reasonably that her fiancee lived with her and would overhear the answering machine. *Id.* at *3. But in a subsequent case, the same judge who decided *Mostiller* limited the holding to its facts. *Clayson v.*

Thompson's motion for summary judgment is granted, and Diversified's is denied, on the issue of whether the single voicemail is actionable under the FDCPA.

### B. Whether Thompson Owed a "Debt" Under the FDCPA

Thompson argues that her payment obligation to United American arose from a loan. She points to the loan agreement provision in her Independent Agent's Contract and a United American account statement stating that she had an "advance loan balance" of $2,302.20. Diversified contends that it was seeking to collect overpaid and unearned commissions arising from Thompson's employment with United American and that those commissions are not debts covered by the statute. Diversified points to Thompson's deposition testimony about a document appearing to show that she owed Diversified $1,840.55 from "chargebacks" of commissions calculated and paid before customers failed to pay insurance premiums used to set the commission amount. (Docket Entry No 29, Ex. B at 4).

"For the FDCPA to apply, the obligation at issue must qualify as a 'debt.'" *Hamilton v. United Healthcare*, 310 F.3d 385, 388 (5th Cir. 2002). "The term 'debt' means any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5). The FDCPA applies to payment obligations of a (1) consumer (2) arising out of a transaction (3) in which the money, property, insurance, or services at issue are (4) primarily for personal, family, or household purposes. The critical dispute here goes to the fourth element.

---

*Rubin & Rothman, LLC*, 751 F. Supp. 2d 491, 496 (W.D.N.Y. 2010) (holding that a voicemail message left on a debtor's mother's number violated the FDPCA and distinguishing *Mostiller* on the ground that it involved a debt collector who "left its message on an answering machine used exclusively by the plaintiff, connected to the plaintiff's telephone number, at the plaintiff's address").

Diversified argues that this court should follow the Third Circuit's statement in *Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163 (3rd Cir. 1987), that "the type of transaction which may give rise to a 'debt' as defined in the FDCPA, is . . . one involving the offer or extension of credit to a consumer." *Id*. at 1168. Diversified contends that commission overpayments based on unpaid insurance premiums are not "debts" because they are not extensions of credit. The Fifth Circuit has defined "debt" more broadly than the Third Circuit did in *Zimmerman*. In *Hamilton v. United Healthcare*, the Fifth Circuit considered whether a group health plan's contractual subrogation claim for reimbursement of benefits it had paid the plaintiff was a "debt" under the FDCPA. In finding that it was, the court implicitly rejected the Third Circuit's view that an FDCPA "debt" is limited to transactions involving an extension of credit. The Fifth Circuit explained that the FDCPA's definition of debt "may not be alternatively read to reference only a limited set of obligations . . . . As long as the transaction creates an obligation to pay, a debt is created." 310 F.3d at 391 (quotation marks and citations omitted). Other courts of appeals have similarly concluded that a "debt" need not result from an extension of credit. *See, e.g.*, *Duffy v. Landberg*, 133 F.3d 1120, 1123 n.2 (8th Cir. 1998) ("[W]e conclude that a debt need not arise from a credit transaction in order to be covered by [the FDPCA]."); *Brown v. Budget Rent-A-Car Sys., Inc.*, 119 F.3d 922, 924 (11th Cir. 1997) ("Extension of credit is not a prerequisite to the existence of a debt covered by the FDCPA."); *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322, 1326 (7th Cir. 1997) ("[A]n offer or extension of credit is not required for a payment obligation to constitute a 'debt' under the FDCPA.").

Diversified points to *Orenbuch v. Leopold, Gross & Sommers*, 586 F. Supp. 2d 105 (E.D.N.Y. 2008), in which a law firm hired by the City of New York sent a letter to a former City employee stating that it had overpaid her salary and requesting that the employee return the

overpayments. The court noted that the FDCPA's "legislative history is, not surprisingly, bereft of any indication about whether overpaid salary constitutes a debt and there are no reported federal cases addressing the issue." *Id.* at 107. The court found that the overpayments were not "debts" under the FDCPA "because the overpayment of salary was not a 'transaction' within the meaning of the statute." *Id.* at 108; *see also Arnold v. Truemper*, 833 F. Supp. 678, 685 (N.D. Ill. 1993) (holding that a bank's overpayment to its customer was not a "debt" because it did not arise "out of any transaction").

Thompson responds that *Orenbuch* is distinguishable and that this court should follow *Oppenheim v. I.C. Sys., Inc.*, 627 F.3d 833. In *Oppenheim*, the Eleventh Circuit considered whether a reimbursement owed by the internet seller of a personal laptop to PayPal, an online payment processor, was a "debt" under the FDCPA. The buyer's payment turned out to be fraudulent. The contract between the seller and PayPal required the seller to return any funds paid by PayPal if it later discovered that the buyer's payment was fraudulent. The seller refused to return the payment. PayPal hired the defendant to collect. The plaintiff seller alleged FDCPA violations. The court found that the amount at issue was a "debt" under the FDCPA, noting that the money was from the sale of a personal computer by an individual who was not selling as a business. The court distinguished *Arnold* and *Orenbuch* because there was no indication in those cases that the plaintiffs "had a contractual obligation dictating their liability in the event of any overpayment." *Id.* at 838. The court explained: "*Arnold* and *Orenbuch* do not stand for the proposition that one who improperly receives money does not incur a 'debt' subject to the FDCPA. Rather, they stand for the proposition that a consumer's obligation must arise from a 'transaction' in order for the FDCPA to apply." *Id.*; *see also Hoffman v. GC Servs. Ltd. P'ship*, 2010 WL 9113645, at *7 (E.D. Tenn. Mar. 3, 2010) ("[P]laintiff's alleged obligation to pay the $1626.43 arose from the User Agreement. This

14

contract empowers PayPal to take action after a sale is complete in certain circumstances. There is no question that plaintiff's alleged obligation stemmed directly from the User Agreement. This is substantially different than *Orenbuch* and *Arnold*, where the plaintiffs' obligations to pay did not arise from a contract or negotiation.").

As noted, in *Hamilton v. United Healthcare*, 310 F.3d at 391, the Fifth Circuit explained that "the ordinary meaning of the term 'transaction' is a broad reference to many different types of business dealings between parties, and does not connote any specific form of payment." *Id*. The court adopted a similarly broad interpretation of "arising out of," noting that these "are words of much broader significance than 'caused by' . . . . [and] are ordinarily understood to mean 'originating from [,]' 'having its origin in,' 'growing out of' or 'flowing from,' or in short, 'incident to, or having connection with.'" *Id.* (alteration in original) (quotation marks omitted). The defendant collection agency in *Hamilton* argued that the plaintiff's subrogation obligation arose from a third-party tort and not from his insurance agreement. The court rejected this argument, explaining that "the plain meaning of 'arising out of' as 'stemming from' leads us to conclude that the obligation to pay arose from the contract/transaction for insurance." *Id.* at 392.

Assuming that Thompson's obligation arose from a "transaction," that does not resolve whether it is one "in which the money or services which are the subject . . . are primarily for personal, family, or household purposes." The Independent Agent's Contract described the commissions that would be paid to Thompson and also provided for a loan by United Healthcare. If, as Diversified contends, Thompson's debt arose from overpaid commissions, Diversified has an argument that the transactions out of which the obligation arose are Thompson's sales of insurance for United American. *See Orenbuch*, 587 F. Supp. 2d at 108 (finding that the salary overpayment did not arise from a consumer transaction). If, as Thompson contends, the debt arose out of a loan

15

or advance made by United American, which she used for personal and household expenses, the debt is covered by the FDCPA. *See Hamilton*, 310 F.3d at 391. Thompson stated that the money was a loan that she used "for personal purposes [including] everyday living expenses, such as clothes and groceries." (Docket Entry No. 26, Ex. C ¶ 4). This factual dispute — loan vs. overpaid commissions — precludes summary judgment as to whether Thompson owed a "debt" to United American under the FDPCA.

### IV.   Conclusion

Diversified's motion for summary judgment, (Docket Entry No. 19), is denied, and Thompson's motion for summary judgment, (Docket Entry No. 30), is granted in part and denied in part. The court finds that there is a genuine factual dispute material to determining whether Thompson's alleged debt arises from a loan from her former employer, which would be a "consumer debt" covered by the FDCPA, or from overpaid commissions, which may not be a consumer debt under the statute. That disputed fact issue precludes summary judgment on the current record. A status and scheduling conference on resolving the remaining issues is set for **August 6, 2013** at 9:30 a.m. in Courtroom 11-B.

SIGNED on July 31, 2013, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge